Kareem PETERSON, Petitioner–Appellant,

v.

Melvin WILLIAMS, Respondent–Appellee.

No. 1280, Docket 95-2728.

United States Court of Appeals, Second Circuit.

Argued April 1, 1996.

Decided May 20, 1996.

Robert S. Dean, Legal Aid Society, Criminal Appeals Bureau, New York City, for Petitioner–Appellant.

Andrea Gayle Klineman, District Attorney's Office, Brooklyn, NY, for Respondent–Appellee.

Before OAKES, WINTER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial...." And the Supreme Court has noted that violations of this provision are not subject to harmless error analysis. *Waller v. Georgia*, 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d 31 (1984) (a requirement that prejudice be shown " 'would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury' ") (citation omitted). But this does not mean that the Sixth Amendment is violated every time the public is excluded from a courtroom. There are situations in which even a significant sealing of a courtroom is constitutionally justified. *See Waller*, 467 U.S. at 44–48, 104 S.Ct. at 2214–17. Moreover, even an unjustified closure may, on its facts, be so trivial as not to violate the charter.

The point is an obvious one. Words, even absolute words, derive their meaning from their context, and it is to context that we must look to see whether what these words require has been contravened. As "Dr. Johnson, who was addicted both to accuracy and to veracity, said ... [I]f one stood before a great orchard and remarked, 'There is no fruit in that orchard,' and there came 'a poring man' who found two apples and three pears, the first speaker would be right in dismissing the objection with laughter."[1]

---

1.  *See* Charles L. Black, Jr., *Mr. Justice Black, the Supreme Court, and the Bill of Rights,* HARPER's

Plain language to the contrary notwithstanding, for most purposes, absence of fruit aptly describes the orchard.

■ And so it is with the words of the Constitution. We must always be reluctant to stretch the meanings of words. And we should be particularly careful not to give them a flavor or a limit they were not intended to have. We should, moreover, be doubly hesitant when the words define constitutional rights. Nevertheless, we frequently cannot avoid looking beyond even constitutional words to determine just what it was they were meant to proscribe or to protect.

That is what this case is about. For in it, we are asked to determine whether a defendant was deprived of his Sixth Amendment right to a public trial when a trial judge inadvertently left a courtroom closed for twenty minutes during which the defendant testified. On the particular facts before us, we conclude that the event complained of was sufficiently insignificant that no violation of the Sixth Amendment occurred.

## BACKGROUND

Kareem Peterson was charged with criminal sale of a controlled substance in the third degree, in violation of N.Y. Penal Law § 220.39(1). He was tried before a jury in the New York Supreme Court, Kings County (Hon. Priscilla Hall, *Justice*).

At trial, the government sought to show that the defendant sold two vials of crack to an undercover police officer, John Faust, on August 3, 1989, at the corner of St. Marks and Classon Avenues in Brooklyn. Before Officer Faust testified, the prosecution requested that the courtroom be closed. Justice Hall denied the motion, finding that no valid reason for closure existed since Officer Faust was no longer involved in undercover work. Officer Faust then testified in open court as to the circumstances of the sale. He added that he did not arrest the defendant immediately, but that the defendant was instead apprehended minutes later by backup officers who identified him on the basis of the clothing he was wearing.

The State then called, as its last witness, Roberto Nieves, an undercover officer who had watched Faust conduct the buy. The prosecution once again requested that the courtroom be closed and Judge Hall granted the motion because at the time Nieves was still undercover. After Nieves testified that he saw the defendant sell drugs to Officer Faust, Peterson briefly took the stand in his defense. He stated that he did not possess or sell drugs on August 3, 1989, and that he was wrongly identified on the basis of the clothes that he was wearing.

Before summation, defense counsel moved for a mistrial, saying that she had "just noticed when we stood up to start summations, that the courtroom was being unsealed for the very first time...." Judge Hall reserved decision on the motion, and later made the following findings:

● "[T]he courtroom had, in terms of an administerial mistake, not been reopened after the second undercover [agent] testified. Although, the Court rule was only to close the courtroom for his testimony and his testimony only."

● "[This] was brought to the Court's attention by counsel for the defense after the defendant testified ... [T]he defendant's testimony was very brief ... [no] longer than fifteen, twenty minutes."

● "Court officers, upon hearing someone at the door, opened the door for individuals who sought entry into the court."

● "[A]t the time the second undercover [agent was about to testify] there were individuals in the courtroom. No one, [though, was] associated with this case[, *i.e.*, with] the District Attorney or defense counsel or even relatives of the defendant."

● "[T]here were some individuals ... in the courtroom who were asked to leave when the second undercover [agent] testified. And, indeed ... it was those individuals who returned to the courtroom...."

MAG., Feb. 1961, at 63, 67, paraphrasing Samuel Johnson, and defending Justice Hugo Black's use of absolutes in constitutional analysis.

[T]hey are individuals who often visit courtrooms."

The court then denied the motion, finding the failure to re-open the courtroom was "an oversight" and "not part of the Court's ruling," that "as soon as it became aware of the fact that it had not been reopened, the Court took steps to reopen the courtroom," and "that no prejudice can be shown against the defendant in terms of this administerial mistake."

The jury found the defendant guilty, and the court imposed an indeterminate 6 to 12 year term of imprisonment.

The defendant brought a direct appeal in the New York courts. The Appellate Division rejected his appeal, holding that the defendant's rights were not violated. *People v. Peterson*, 186 A.D.2d 231, 587 N.Y.S.2d 770 (2d Dep't 1992). The court found that only "spectators, rather than members of [petitioner's] family" had been removed from the courtroom, that the unauthorized closure had lasted fifteen to twenty minutes, and that the courtroom was immediately reopened when the mistake was discovered. 186 A.D.2d at 231, 587 N.Y.S.2d at 771. It "conclude[d] that it is not necessary, in order to advance the[ ] purposes [served by a public trial], to require a reversal where the closure was completely inadvertent, and no evidence was offered that any observer wishing to enter was excluded." 186 A.D.2d at 232, 587 N.Y.S.2d at 772.

The New York Court of Appeals affirmed the Appellate Division order in a memorandum opinion: "The brief and inadvertent continuation of a proper courtroom closing, which was not noticed by any of the participants, did not violate defendant's right to a public trial." *People v. Peterson*, 81 N.Y.2d 824, 595 N.Y.S.2d 383, 611 N.E.2d 284 (1993).

The defendant then brought the instant federal habeas action, which was denied.

The district court (Gleeson, *J.*) found that the continued closure after Officer Nieves' testimony was inadvertent. *Peterson v. Williams*, 901 F.Supp. 119, 122–23 (E.D.N.Y. 1995). It also noted that the courtroom was immediately reopened upon discovery. *Id.* at 122.

From this denial of his petition, Peterson appeals.

## DISCUSSION

The Sixth Amendment guarantees defendants "the right to a ... public trial...." That right is not, however, absolute. A trial can be closed if exigent circumstances require it. *See Guzman v. Scully*, 80 F.3d 772, 774 (2d Cir. 1996). Indeed, the defendant himself does not suggest that Justice Hall's decision to close the courtroom during the testimony of Officer Nieves violated the Amendment. He contends instead that the *continuing* closure, *after* Nieves testified, breached the Constitution. We disagree.

The circumstances of this case are more unique than rare. And the facts are not substantially contested.[2] They show that the unjustified closure that occurred was too trivial to amount to a violation of the Amendment. A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury." It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.

Other courts have made analogous distinctions. They too have held that a temporary closure may, at times, not violate the Sixth

---

**2.** The district court noted that the "facts suggest" that the continuing closure lasted "between 30 and 40 minutes." 901 F.Supp. at 121. Though the court did not provide any support for this claim, it did note that the defendant's testimony was "for fifteen to twenty minutes." *Id.* at 120 (footnote omitted). To the extent that the district court's finding conflicts with the New York State court's own factual findings, we are obliged to follow the latter unless it "is not fairly supported by the record." 28 U.S.C. § 2254. Our review of the record confirms instead that the closure did not last much longer than twenty minutes. After the defendant testified and before the defense counsel objected to the continuing closure, only about three-hundred and fifty words were uttered.

Amendment. In *Snyder v. Coiner*, 365 F.Supp. 321 (N.D.W.Va.1973), *aff'd*, 510 F.2d 224 (4th Cir.1975), for example, a deputy sheriff closed the courtroom doors during summation because he had misunderstood a state trial judge's order to keep the courtroom quiet. The district court, reviewing the defendant's petition for a writ of habeas corpus, found no violation because the closure was only for a "relatively small portion of the trial" and because "[n]either the judge nor the parties were aware of any exclusion of the public taking place." *Id.* at 324.

On appeal, the Fourth Circuit affirmed the district court's decision. It stated: "Such condition existed for but a short time and was quickly changed by the Court, when advised of the action of the bailiff.... The incident was entirely too trivial to amount to a constitutional deprivation." *Snyder*, 510 F.2d at 230. *See also United States v. Al–Smadi*, 15 F.3d 153, 154–55 (10th Cir.1994) (closure that was "brief and inadvertent," "unnoticed by any of the trial participants," and did not "recur[ ]" did not violate Sixth Amendment).[3]

The incident before us was no more significant than that in *Snyder* and was as inadvertent as that in *Al–Smadi*.[4] The defendant suggests, however, that the closure, though brief, occurred at a crucial phase of the trial: namely, during the time that he took the stand. But, in fact, the public may not have missed much of importance as a result of the accidental closure, since just about all of the defendant's testimony that was relevant was repeated, soon after he testified, as part of the defense counsel's summation. In the summation, the defense reiterated and emphasized what the defendant had said on the stand. *See, e.g.*, Trial Tr. at 126 ("You heard what my client said. He went into a store. He bought a pack of cigarettes. He came out and he was arrested.").

Of course, not all of the spectators who, in the absence of the closure, would have heard the defendant testify were necessarily present in the courtroom during the summation. And so, the summation's incorporation of the defendant's testimony cannot by itself resolve the Sixth Amendment question. But it does bear on how seriously the values served by the Sixth Amendment were undermined.

The Supreme Court has described the values furthered by the public trial guarantee as four: 1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury. *Waller*, 467 U.S. at 46–47, 104 S.Ct. at 2215–16.[5] The first, second, and fourth of these reasons are hardly in issue in this case given the brevity and inadvertence of the closure. (For example, since the defendant did not know of the closure and he was the only one to have testified during it, the closure was most unlikely to have encouraged perjury.)

The third reason, encouraging witnesses to come forward and confirm or reject the testimony offered during closure, might

---

3. *Cf. Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 512, 104 S.Ct. 819, 825, 78 L.Ed.2d 629 (1984) ("When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time...."); *Woods v. Kuhlmann*, 977 F.2d 74, 77–78 (2d Cir.1992) (finding that a partial closure order was justified in the circumstances of the case and hence did not violate the Sixth Amendment); *United States v. Sherlock*, 865 F.2d 1069, 1076–77 (9th Cir.1989) (same); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir.1984) (per curiam) (upholding its prior decision that partial closures are treated more leniently even after the Supreme Court vacated the earlier ruling and remanded it for reconsideration in light of *Waller* ), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

4. The defendant cites three cases in his brief to support his assertion that "[t]he authorized closure for the undercover's testimony cannot excuse the negligent continued closure." Appellant's Br. at 19 (citing *Waller v. Georgia*, 467 U.S. at 48, 104 S.Ct. at 2216–17; *United States v. Clark*, 475 F.2d 240, 246 (2d Cir.1973); and *Daniel v. Kelly*, 1990 WL 130523 (W.D.N.Y. Aug.31, 1990)). None of them discusses inadvertent or negligent closures at all.

5. This list is not exhaustive. *See* Akhil Reed Amar, *Foreword: Sixth Amendment First Principles*, 84 Geo. L.J. 641, 677, 681, 686 (1996). The additional reasons mentioned by Professor Amar, however, do not suggest any grounds for finding a violation in this case.

have been somewhat implicated. But the repetition, in the summation, of the defendant's brief testimony could well have served to give notice to some potential corroborating witnesses.[6] It follows that the rights sought to be protected by the words of the Constitution have not been infringed in this case.[7]

We do not hold today that the fact that a closure of a courtroom was brief, that it was inadvertent, or that what went on *in camera* was later repeated in open court, by themselves, mean that no Sixth Amendment violation occurred.[8] We do not even hold that the combination of all three necessarily compels a finding of constitutionality. We only hold that in the context of this case, where the closure was 1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent, the defendant's Sixth Amendment rights were not breached. Standing in front of "a great orchard" we can say "there is no fruit in that orchard," even though "two apples and three pears" may be found there.

## CONCLUSION

Because the closure of the defendant's trial was sufficiently trivial that the defendant's Sixth Amendment rights were not violated, we affirm the decision of the district court.

6. Whether a court would commit reversible error in failing to hear the testimony of a corroborating witness who comes forward belatedly, *i.e.*, only after hearing the defense counsel's summation following an inadvertent closure of the court, is not before us today.

7. The State also contends that if members of the public had knocked on the courtroom doors after Nieves's testimony, they would have been admitted into the courtroom, and that the courtroom was therefore not closed. We reject the State's argument. The fact that no one knocked is of no significance. Spectators do not have the burden of banging on closed courtroom doors during trial. And this is particularly so when the courtroom had been previously sealed. The government notes that spectators eventually did knock on the door and that they were permitted to enter. But the possible existence of some spectators brave or arrogant enough to seek admission does not convert the courtroom into an open

one. Indeed, such spectators, though they were admitted when they did knock, could well have delayed knocking for a long enough time to raise constitutional difficulties.

8. For example, it might be that an intentional (not inadvertent) improper closure could threaten a defendant's right to a fair trial, even when the closure is for a brief time and the public hears a recap of the testimony during summation. Similarly, a long closure might perhaps prevent witnesses from coming forward and so might implicate other Sixth Amendment interests, even when it is inadvertent and where a summation (made in open court) recaps the closed testimony. Conversely, it is also possible that when a closure is entirely accidental, the Sixth Amendment would only be deemed violated when prejudice is shown. Since none of these cases are before us, however, we express no opinion on any of them.